PRODUCERS PIPE LINE CO. v. DOUGLAS GUARDIAN WAREHOUSE CORPORATION et al.

No. 228.

District Court, M. D. Tennessee, Nashville Division.

Jan. 13, 1943.

Henry Goodpasture, of Nashville, Tenn., and Kremer, Branard & Hayes, of Chicago, Ill., for Producers Pipe Line Co.

Keeble & Keeble, of Nashville, Tenn., for Douglas Guardian Warehouse Corporation.

W. M. Fuqua and J. Ross Cheshire, both of Nashville, Tenn., for River Terminal Co.

DAVIES, District Judge.

### Findings.

In this case the Court finds:

1. That libelant was the owner of the certain steel tank barge "N. B. C. 501", which was a tow barge for the carriage of petroleum products. She was purchased new from her builders by libelant on or about July 5, 1940, for $10,600, and was later supplied with a cargo discharge pump installation, located on the weather deck, consisting of a pump and engine to drive the pump. A certificate of inspection for the barge was issued on May 8, 1940, and the pump installation was inspected and approved by the U. S. Steamboat Inspectors at Louisville, Kentucky, on August 15, 1940. The pump engine was covered with a weather housing, one end of which formed a metal shield between the pump and the pump engine. When first installed the engine had a water-cooled manifold and water cooling of its exhaust pipe extended upward and included the exhaust muffler, located immediately above the.

weather housing of the pump engine, which muffler was also water cooled. The U. S. Steamboat Inspectors required the exhaust pipe to be extended upward from the water-cooled muffler, a distance of approximately two feet, and this portion of the exhaust pipe, which was not insulated or water-cooled, had· a spark arrestor at the top or discharge end, consisting of metal screening, such as was approved on installations of this type.

2. Located on top of the pump was a flat primer plate. This plate was necessarily removable, for priming the pump, and was secured with nuts (each turning on a stud bolt) to be screwed against the plate, so that in operation, the primer plate by pressure of the nuts could be made tight to prevent leaks from the pressure of the fluid inside the pump. Some pumps have primer plates and some have valves for priming. This whole discharge pump installation on this barge, besides being approved for operation by the U. S. Steamboat Inspectors, was such as is approved for underwriting purposes.

3. On August 30, 1940, the vessel was discharged of a cargo of kerosene at New Albany, Indiana, and in that operation the cargo was pumped up from the barge into shore tanks a perpendicular distance of about fifty feet. The pump worked excellently and did not leak, and was in good condition at the end of the operation.

At the commencement of the trip to Nashville, where she arrived on September 6, 1940, the vessel was loaded with kerosene at Louisville, Kentucky, with the shore equipment of the Aetna Oil Company without the use of the pump equipment on the barge.

The vessel was moved from Louisville, Kentucky, to Nashville, Tennessee, by the Motor Vessel "Charlotte", a stern wheel, Diesel powered towboat, by whose operation the barge was pushed.

4. The cargo of kerosene wherewith the vessel was laden had been sold to the respondent River Terminal Company. The vessel, so laden, was delivered in the morning of September 6, 1940, afloat at a landing on the Cumberland River, a navigable stream, near Nashville, Tennessee.

There .is a sign near the water's edge carrying the name of Douglas Guardian Warehouse Corporation, to which River Terminal Company had subleased a certain pipe line and tanks located on the shore adjacent to said landing, used for the discharge and shore storage of barge cargos of petroleum products.

The towboat left the vessel there with the licensed tankerman at the premises, one Payne, after the cargo had been gauged by the towboat master and one Dandridge W. Caldwell.

5. The said pipe line (subleased with the said tanks by Douglas Guardian Warehouse Corporation) commenced at or near the river's edge at said landing, where it had a shutoff valve near the intake and down by the river, and ran up over the river bank and inshore a distance of over two hundred feet into a "header pipe", which header was a short pipe with its ends blanked off and set at right angles to the main pipe line. Said pipe line and said header pipe were four inches in diameter. Leading off the header were several pipes of two inch diameter, each with its separate shutoff valve, one such two-inch pipe running to each of the said shore tanks. This construction of said pipe line was such that pumping into the four-inch line from the river would build up back pressure in the line (and in the pump connected therewith) whenever less than four of said two-inch lines were open.

6. After the vessel was tied up at the landing, Mr. Payne, the tankerman, who was employed by the Douglas Guardian Warehouse Company as a bonded watchman, went down and made an inspection of the pumping apparatus, which was the first one of that type he had seen. He started the motor which operated the pump and noticed that the pump did not have any clutch on it to enable the motor to run without the pump running, and then shut it off. Later on, at one or two o'clock that afternoon, arrangements were made to go down and unload the barge.

Payne and Caldwell set about discharging the cargo. They had, within a few hundred feet, a pump owned by River Terminal Company used for discharging such cargo, and with which this cargo could have been discharged. They elected to use the pump located on the vessel. Payne put gasoline in the pump motor.

The said pipe line up from the river to the storage tanks was full of gasoline from a previous cargo. The initial stage of the operation attempted by Caldwell was to move this gasoline through and out of said

pipe line into a gasoline tank ashore, by operating the pump on the vessel so as to push out the gasoline with the kerosene moving up the said pipe line from the vessel.

7. The valve in the main pipe from the landing at the river up to the top of the bank was opened at that time by Mr. Dandridge Caldwell, who was there superintending the transfer of the gasoline that was in the large pipe into one of the storage tanks containing gasoline.

Payne had seen the said primer plate on the pump, but did not attempt to tighten the removable primer plate flange down. His failure to do so is aggravated by the facts that the day was hot (which would increase the vaporization of kerosene) and that he was about to pump inflammable cargo uphill into a pipe system that under existing conditions would build up back pressure. The vessel necessarily had "ullage holes" communicating with the inflammable cargo, which had to be opened during discharge of cargo. The temperature that day was 87 degrees to 88 degrees according to the local weather bureau.

Caldwell stationed himself at the header pipe when pumping commenced. Only one of the two-inch lines coming off the header pipe was open. Caldwell occasionally opened and closed a quick closing "bleeder valve" off the header pipe, his purpose being to tell when the gasoline already in the pipe line stopped coming through, and when the kerosene showed up. Kerosene and gasoline were not supposed to be mixed in the shore tanks. From where he stood by the header pipe Caldwell could not see the barge, which was down against the river bank, but one James Caldwell was stationed on the bank to transmit signals between Dandridge W. Caldwell at the header pipe and Payne on the vessel.

The respondents did not produce as a witness said James Caldwell, who was standing where he could see the vessel, nor did they account for their failure to produce him.

8. After the motor had been running about five minutes and the exhaust pipe had gotten hot, the explosion occurred. Testimony as to the cause thereof is rather indefinite, and the Court will have to determine this from the physical facts presented.

Now in order for the kerosene to have sprayed from under the primer plate, it seems to the Court that the plate must necessarily have had to be loose, because if it fitted tightly and had been held in place securely by the nuts on the stud bolts holding it, I can't account for any way in which the accident could have happened in the light of the circumstances detailed.

The tankerman says that he didn't prime the pump before beginning pumping operations. Likewise, the tankerman that unloaded the vessel on the preceding trip said he did not prime it either, but the Captain of the tow vessel says he did. I am inclined to think that the tankerman Payne in this case must have primed the pump, but that is only my personal thought about it, and as there is no proof in the record to sustain any such finding I do not make that finding, but I can't help having my own ideas about it. I don't know why it is that both tankermen deny that they primed the pump, but that will not affect my decision in any way as I am not making any such finding in the case; there would be no evidence to sustain it. At any rate, here was a tankerman handling kerosene in warm weather, and on September 6th in this community the Court takes judicial knowledge of the fact that the weather gets pretty warm. Of course, the warmer the weather, the easier it is for kerosene to vaporize. He had to unload the barge of kerosene by pumping it through the pump and out of the large pipe and to think that a man would just start in to unload a barge of kerosene in the hot summer time, using a pumping apparatus such as he had never seen before, without making any examination of it except just to look at it, seems to me to be negligence per se. Payne stated that he was familiar with pumps for pumping kerosene and gasoline from barges, but all the pumps that he had operated before were fitted with a valve that was used for the purpose of priming. Certainly, if he had started to unload a barge full of kerosene or gasoline with a pump so fitted he would surely look to see whether or not the priming valve was closed, any reasonably prudent tankerman would have turned the valve to ascertain if it was closed or open, and if he had had any experience at all and was competent, he would know that a primer plate on a pump of this kind served the same purpose as primer valves on pumps such as he was familiar with.

9. The evidence shows that within two hours after the explosion and accident,

Captain Schmoker went on the vessel and with his fingers turned the nuts on the bolts holding the primer plate in place, and at that time he inserted the blade of his knife between the primer plate and the seat upon which it fitted. He also stated that at that time, the asbestos gasket, that fitted between the flange on the primer plate and its seat was in good condition, had been through the fire and had not been burned, and there is no evidence in the record at all, that the gasket was in any way injured.

Now, if Mr. Payne had tried to turn those nuts with his fingers, not to mention trying them with a wrench which any reasonably prudent tankerman should have done, I am bound to conclude that he would have found that they were loose.

Just how that condition occurred, I can't say; there is no proof to show whether or not the nuts were loosened during the voyage the vessel made from some place in Indiana, where it was unloaded about a week before, or whether they became loose after she took on a new cargo at Louisville, or whether Mr. Payne primed the pump and left them loose, if he did. But the physical facts are that the pump was used about a week before, in pumping a load of kerosene out of the barge, and it performed its duties satisfactorily. It seems to me that if the primer plate had been loose then, loose enough to enable one to insert a knife blade between the flange and the seat of the plate, that certainly kerosene would have sprayed out of the pump from under the primer plate when it was unloaded the week before, but no complaint was made of that. It was a new pump and there is no intimation in the record that there was any latent defect in it or in the priming plate. Yet, within about two hours after the explosion, Captain Schmoker went on this barge and turned those nuts with his fingers.

I am bound to conclude that the nuts were loose at the time Mr. Payne began his pumping operation and that if he had inspected them or tested them in any way, he would have discovered that they were loose, and the fact that he did not do so was negligence on his part. Further, that the nuts were loose only to such an extent that when the required amount of pressure was exerted upon the primer plate by reason of kerosene being pumped into the four-inch pipe and pushing the

gasoline out through a two-inch outlet, that when the point was reached where that pressure became sufficient, it caused the kerosene to spray from under the primer plate onto the exhaust pipe which was hot enough to cause the kerosene to vaporize and explode. A shore time before the explosion Payne noticed a seepage of kerosene around the pump and had just stopped the motor which permitted the dead weight of all the liquid in the long pipe line to build up pressure inside the pump. This is the only reasonable explanation of the explosion that the Court can give from all the evidence.

10. I therefore find that the negligence of Mr. Payne in failing to properly secure the priming plate in question, or to see that it was properly secured, was the proximate cause of this explosion. However, I find, as the defendants have insisted, that if the exhaust pipe had been insulated with asbestos, or some other insulating material, the probabilities are that had the kerosene sprayed on it, there would have been no explosion. I take the view that it is negligence to leave an exposed exhaust pipe in a place where inflammable liquid is likely to come in contact with it, and this something a reasonably prudent man should know, and especially should be known to people who are experienced in the business of handling inflammable liquid. It is my idea that people who handle gasoline and kerosene, dynamite and explosives and articles of that nature that are inherently dangerous, are required to use the very highest degree of care. Also people who furnish appliances for the handling of these different articles are required to use a high degree of care, and even though the appliance in question was approved by the Underwriters, I still am of the opinion that leaving an exposed exhaust pipe in that position was negligence, and that it contributed to the explosion and should be taken into account in mitigating damages in this case.

Accordingly, the Court finds that the negligence of Payne was the proximate cause of the explosion; that the negligence of the libelant in this case in furnishing the appliance that it did, constructed in an unsafe manner, is contributory negligence that should be taken into consideration in mitigating the damages in this case.

11. All of which now brings us to the question of damages. It has been testi-

fied in this case, and the Court so finds, that the cost of the vessel at the time it was delivered to the libelant was $10,600. It was delivered on May 8, 1940, just about four or five months before the accident. The vessel was in good condition, she was practically new and at that time there was a large demand for barges. She had an expectancy of life and service of twenty years or more, and being only four or five months old at that time, she had not suffered any depreciation such as would reduce her value to any considerable extent, and I find that the value of the vessel at the time of the explosion was $10,600, not including the $125 for towing charges for delivery to Smithland, Kentucky.

After the explosion the libelant attempted to have the vessel repaired at the Nashville Bridge Company, but it was such an unpromising looking job the Nashville Bridge Company turned it down; they thought it would cost about as much to repair it as to build a new barge, and declined to repair it for that reason, also, they had capacity work at the time. There is testimony here that after the explosion the vessel was practically worthless; that she could be sold for about $800 as junk, and to junk it would entail a cost of $500. I am not inclined to accept that view, I think there was some value to the vessel; I find from all the evidence that the vessel had a value of $2,000 at that time, which figure will coincide with the other view that I have on the question of damages relative to the value of the vessel after she had been repaired. There is testimony that it cost $7,139.22 to repair the vessel, but this included an item of $497.08 representing the salary of the president of libelant, which was excluded. So, the Court finds that the cost of repair of the vessel was $6,642.14; to this amount should be added the sum of $210. required to make her gas-free, making a total cost of repair $6,852.14. After the vessel was repaired, she was, of course, not as valuable as she was when new; she was not as strong. The repairs did not put the vessel in the same condition as before the disaster. Kinks and distortions remained in her members and plates. These will affect the life and market value of the vessel and increased power will be required to tow it. Fire, and also explosion, produce heat, which destroys the temper of metal so that although it appears the same, it may and usually will fail. After such repairs as were made had been effected, the vessel was certified for further use by the U. S. Steamboat Inspectors on December 4, 1940, but the pump housing plate that had been through the accident cracked, and the pump had to be replaced. Other than the pump, and part (not all) of the metal showing distortions, none of the metal that had been through the fire and explosion has been replaced.

The vessel was never repaired in the sense of being restored to the same condition or value as before the disaster; that would have cost as much as a new barge, and was not attempted.

The Court further finds that after all repairs made on the vessel were effected, it was not as strong as before the explosion; that her plates were bent and crooked and out of line, and the braces inside were bent and not all straightened, particularly in the rake, and that she was less valuable after the explosion and after being repaired than she was before the explosion, by the sum of $2,000, making her present value $8,600. The Court holds the measure of damages in this case to be the cost of repair, $6,852.14, plus the difference in value before the explosion and after being repaired, in the amount of $2,000 making the total $8,852.14. This is approximately the same amount that would be derived by deducting $2,000 representing the difference in value of the barge before and after the explosion, from $10,600 the purchase price, to-wit, $8,600, and adding to that amount $210, charges for gas-freeing the barge, which makes it work out about the same either way you figure it.

The Court therefore finds that the damages to the vessel amounted to a total of $8,852.14.

12. I shall now consider the question as to the parties liable for these damages, which is, in itself, a very perplexing matter. The primary question in the case is whether the Douglas Guardian Warehouse is liable, or the River Terminal Company, or both. I was at first inclined to take the view that Douglas Guardian Warehouse was solely liable, but I have changed my mind on that. I find there is liability of both, on account of the particular circumstances of the case. Of course, the business of the River Terminal Com-

pany was selling gasoline and kerosene and it caused the storage tanks and pipe lines to be built and leased them to the Douglas Guardian Warehouse Company. The agreement between the respondents (in which Douglas Guardian Warehouse Corporation was designated as "party of the first part" and River Terminal Company as "party of the second part" provided as follows: "Fourth: That party of the second part as its sole charge and expense shall furnish to party of the first part all labor, material, etc., required for the receiving, handling, delivering, moving, re-conditioning, labeling and for the protection and/or preservation of the merchandise covered by this contract. Said labor shall be subject, when performing said services, to the exclusive direction and control of party of the first part."

Respondents, by said contract between them, excluded River Terminal Company from any control of labor, receiving or moving, such merchandise, and expressly vested the exclusive control of such labor in respondent Douglas Guardian Warehouse Corporation.

13. The nine storage tanks on the premises would hold a considerable supply of gasoline and kerosene, and as is usual with companies operating this kind of business, it is sometimes necessary to finance the purchase of sufficient commodities to carry on business. When a company in the business of buying and selling gasoline has a large stock, several barge loads or in storage tanks on hand and wants to borrow money on it, that on account of the nature of the commodity it is sometimes difficult to finance on account of the physical situation and legal requirements. So the custom of warehousing particular commodities has grown up in order to assist in the financing of purchases of large quantities of gasoline and kerosene and other commodities. Here the River Terminal Company leased practically its entire plant to the Douglas Guardian Warehouse Company as part of the plan for financing its purchases of gasoline and kerosene and profitably marketing articles of this type. There was little physical equipment except the storage tanks and pipe lines, and a very small office. The storage tanks located on the property, also the four-inch pipe line running from the river to the storage tanks, and the particular premises described in the lease as fronting on the Cumberland River and running to the river, all was conveyed in the lease.

14. Two employees of the Douglas Guardian Warehouse Company, Mr. Dandridge Caldwell and Mr. Payne, were paid by the Douglas Guardian Warehouse Company, but under the contract, the amount of their salaries was reimbursed Douglas Guardian Warehouse Company by the River Terminal Company. According to the contract between the River Terminal Company and the Douglas Guardian Warehouse Company, the Douglas Guardian Warehouse Company was to have sole supervision over their services and they were to be under the exclusive control of the Douglas Guardian Warehouse Company. It further appears, when this particular barge of kerosene arrived, in order to finance it or in order to secure the delivery of the kerosene, it was necessary to secure a bill of lading attached to a sight draft in the Third National Bank and Mr. Dandridge Caldwell, who was ostensibly the employee of Douglas Guardian Warehouse Company, went to the Bank and carried with him a note of the River Terminal Company, and as the representative of the River Terminal Company, he delivered that note to the Bank, but, as the representative of the Douglas Guardian Warehouse Company, after the Bank had discounted the note of River Terminal Company and paid the draft, he agreed to accept the delivery of the kerosene for Douglas Guardian Warehouse Company, and agreed with the Bank that he would hold it as warehouseman as interim security for the note of River Terminal Company which had just been discounted by the Bank and that he would, as soon as the kerosene was unloaded, issue tally sheets which would be placed with the Bank as interim security until the regular warehouse receipts could be issued and delivered to the Bank to hold as collateral security on said note; that he accepted the bill of lading and thereby secured the delivery of the kerosene and commenced operations to have it pumped into the storage tanks.

Whose representative was Mr. Caldwell, and for whom was he acting at the time? There is no doubt but that both he and Mr. Payne were acting in a somewhat dual capacity. The primary business of River Terminal Company, as stated, was the buying and selling of gasoline and kerosene, and if they had not had these arrangements with the Douglas Guardian Warehouse Company, the whole plant would have been considered under their control, and where they carried on their business. But they

leased all of it, tanks and pipe lines, to the Douglas Guardian Warehouse Company. That arrangement, however, was just as much for the benefit of River Terminal Company as it was the Douglas Guardian Warehouse Company, because all the Warehouse Company received was a fixed charge for their warehousing service. After the lease was made, the River Terminal Company occupied only the small office from which they sold gasoline and carried on their business. But, at the time or before the kerosene could be unloaded from the barge, it was necessary to clear the large pipe line of the gasoline it contained. That particular gasoline was in the custody and possession of the Douglas Guardian Warehouse Company, and they had already issued their warehouse receipts against it and had assumed control over it. Why they didn't clear the gasoline from the pipe and place it in tanks, after the barge in which it was delivered had been unloaded, I am unable to say, unless it would have been the amount of extra labor involved in performing that duty or the act of removal.

Evidently there was a considerable amount of gasoline in the four-inch pipe, which as I recall, was possibly 200 or 250 feet long. Now that gasoline in the pipe was in the custody of the Warehouse Company, and the Warehouse Company was in the act of removing it from the pipe to the proper storage tank at the exact moment the explosion occurred. That is clearly evident from the testimony of Mr. Caldwell, who says he was standing at the header pipe on the bluff end of the four-inch pipe. He had opened one of the two-inch outlet pipes so as to carry the gasoline to its proper storage tank. The pump on the barge was operating at that time, pushing the gasoline in the large four-inch pipe through the two-inch pipe into the proper storage tank. Caldwell was operating the bleeder valve which opened and closed quickly for the purpose of ascertaining when the gasoline stopped running out of the bleeder valve and when the kerosene began, the gasoline being colored and the kerosene being clear. The kerosene had not begun to run from the bleeder valve and none had run from the bleeder valve before the explosion occurred, indicating the gasoline had not been cleared from the pipe line. Caldwell says, at one time, he thought that possibly the kerosene had begun to run, but that he ex-amined the fluid closely and saw that it was gasoline instead of kerosene.

Mr. Caldwell, as stated, was acting in a dual capacity, and Mr. Payne was acting in a dual capacity, but, as between the two parties, the River Terminal Company and the Guardian Warehouse Company, these two employees were exclusively under the control of the Warehouse Company.

It occurs to me that the Warehouse Company was negligent in this case in not knowing just what was going on down at the storage tanks all the time or not caring, they certainly permitted these two men to carry on business for the River Terminal Company without objection. Mr. Ruffin, an official of the Warehouse Company, knew about the arrangement for the purchase of the gas made with the Third National Bank, and knew that barges stopped at the landing of the River Terminal Company and unloaded and knew the different duties required of employees in unloading kerosene and gasoline from barges and said he had instructed his representative there to see that no water or gas or kerosene of different grades got into any pipe lines that would carry it into any tank in which a different grade of gasoline or kerosene was stored. This was what Mr. Dan Caldwell was doing at that time, he was seeing that the gasoline in the pipe line was properly transferred to one of the tanks used for gasoline and to stop the transfer immediately when the kerosene showed up in the pipe line so it could be transferred to another tank.

15. I do not find that the Douglas Guardian Warehouse Company specifically agreed to unload any barges, and I do not consider it necessary for the decision of this case so to find, because it clearly appears the nature of the duties of Mr. Caldwell and Mr. Payne while in the service of both the Warehouse Company and the River Terminal Company so overlapped, without any clearly marked line of demarcation, that it would be impossible to ascertain just who they were doing work for, and that generally at the time the accident happened they were really performing duties for both the River Terminal Company and the Douglas Guardian Warehouse Company; but at the exact moment the accident happened, their particular duties at that time, or the services being performed at that time, was on behalf of Douglas Guardian Warehouse

168

Company, in clearing the large pipe of gasoline which was already in their custody and control, and that, insofar as liability between the respondents in this case is concerned, that while both, under the peculiar circumstances of the case, the interrelationship of these two defendants, the nature of the duties of the employees and the impossibility of determining just when the duties ceased for one company and began for another, which was required by the Douglas Guardian Warehouse Company, that, for all these reasons in this case, the Douglas Guardian Warehouse Company should be primarily liable and the River Terminal Company secondarily liable.

16. As to the total amount of liability, I have considered this question from what I deem to be a purely equitable viewpoint. The Court finds that the damages should be mitigated on account of libelant's failure to insulate the upper portion of the exhaust pipe, by reducing the same one-third, and by denial of interest on the entire claim. This reduction would amount to $2,950.71, and the two respondents should be liable for the remainder of the damage, or $5,901.43, for which judgment will be entered, as herein indicated.

## Conclusions of Law

1. This Court, sitting in admiralty, has jurisdiction of the parties and the subject matter of this cause.

2. The disaster was caused by negligence for which the respondent Douglas Guardian Warehouse Corporation is primarily chargeable, and the respondent River Terminal Company is secondarily chargeable.

3. Libelant is entitled to a judgment in the amount of $5,901.43, with interest at the legal rate of six per cent per annum from the date of this finding, against both respondents and for the payment of which the respondent Douglas Guardian Warehouse Corporation is primarily liable, and execution therefor shall not issue against respondent River Terminal Company except upon further orders of the Court, when it appears that libelant has exhausted all its remedies for the collection thereof against the Douglas Guardian Warehouse Corporation.

Judgment will be entered accordingly.